*Summons issued which cut*
*H.to ProSeOfc*

ORIGINAL

6 *Pro 6.*
*Rec .137799*

*1 mur*
*12/16/02*
*bp*

*2 mur*

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

4:CV 02-2256

Ram B. Bhagat
2302 Oak Leaf Drive
State College, PA 16803

CIVIL CASE NO._____
(to be supplied by Clerk
of the District Court)

(Enter above the full name of
plaintiff in this action)

v.

Edward R. Hintz, Jr., Graham Spanier, Rodney
Erickson, Robert Secor, Eva Pell, L. Raymond
Hettche, Thomas Donnellan, Maurice Amateau,
Timothy Eden, et al., 205 Old Main, Penn State
University, University Park, PA 16802-1571

FILED
HARRISBURG, PA

DEC 12 2002

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

(Enter above the full name of
defendant(s) in this action)

COMPLAINT

1. The plaintiff ___Ram B. Bhagat_____ a citizen of

the County of ___Centre_____ State of

Pennsylvania, residing at ___2302 Oak Leaf Drive, State College, PA 16803___

wishes to file a complaint under ___Title VII of the Civil Rights Act of 1964,___

(give Title No. etc.)

as amended in 1991, 42 U.S.C. Sec 2000e-2

2. The defendants~~is~~ are ___Edward R. Hintz, Jr., Graham Spanier, Rodney Erickson, Robert Secor,___

Eva Pell, L.Raymond Hettche, Thomas Donnellan, Maurice Amateau, Timothy Eden, et al.

3. STATEMENT OF CLAIM: (State below the _facts_ of your case.  If you have paper

exhibits that give  further information of your case, attach them to this

completed form.  Use as much space as you need.  Attach extra sheet(s) if

necessary) ___Ram B. Bhagat is a proud citizen of The United States of America; he is___

- 1 -

3. (CONTINUED) _ not a "foreigner". He remains "Penn State Proud" even after his

wrongful termination in retaliation of his bringing up the issue of discrimination,

harassment and poor work climate. In essence, Ram Bhagat stands up to the

academic principles of the University and raises the issues of

PATENT/INVENTION DISCLOSURE THEFT and PLAGIARISM by his

supervisor M. F. Amateau. M. F. Amateau immediately starts a yearlong retaliation

against Ram Bhagat by way of disparate treatment (discrimination) and harassment

making it impossible for Ram Bhagat to function effectively in his job. R. Bhagat

perseveres discrimination and harassment and does not quit. (Continued on Page 3)

4. WHEREFORE, plaintiff prays that

(state what you wish the Court to do)

     Reinstatement of R. Bhagat

     Revisions to University Policies

     Administrative sanctions to strengthen AAO

     Disciplinary actions against the perpetrators of discrimination and retaliation

     Back Pay to R. Bhagat

     Compensatory damage award to R. Bhagat

     Punitive damage award to R. Bhagat

*RBhagat*    12-12-2002

(Signature of plaintiff)

## 3. STATEMENT OF CLAIM (CONTINUED)

Guided by the University policies against retaliatory discrimination and harassment, Ram Bhagat makes an internal complaint (formal) of retaliatory discrimination, harassment and poor work climate to M.F. Amateau's supervisor Tom Donnellan seeking a resolution. This complaint is responded adversely in the form of a massive and immediate retaliation. An illegal scheme is conspired to make Ram Bhagat insubordinate and to use that as a pretext to fire him without due process. This is done with the illegal concurrence of Eva Pell and the Office of the President (Graham Spanier, Rodney Erickson and Robert Secor). Ram Bhagat follows all internal and external grievance procedures leading to the issuance of NOTICE OF RIGHT TO SUE WITHIN 90 DAYS by the United States Department of Justice on 16 September 2002 (Exhibit A).

Pursuant to the NOTICE OF RIGHT TO SUE Ram Bhagat hereby institutes a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. against The Board of Trustees, Administrators and certain employees of The Pennsylvania State University (also known as Penn State) in the United States District Court for the Middle District of Pennsylvania. The civil action makes the following Claims against the Penn State Board of Trustees for their failure to exercise appropriate and effective oversight responsibilities over the

management and against the administrators and certain employees for their malicious and reckless indifference, and their egregious and outrageous conduct in illegal employment decision seriously violating federally protected rights of the citizen and in utter disregard to the mandates of the Penn State Faculty Handbook against Ram Bhagat who served Penn State for seventeen years as a productive member of the faculty with a great pride.

**Claim #1. That Ram Bhagat, a non-white of Asian/Indian national origin, is a member of "protected class" under Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-2 as expanded by the Civil Rights Act of 1991.**

**Evidence:** In reference to EEOC Charge Against Penn State University, Applied Research Lab, et al. No. 17FA13350, the United States Department of Justice (Civil Rights Division) issues a NOTICE OF RIGHT TO SUE WITHIN 90 DAYS to Ram Bhagat on 16 September 2002 (Exhibit A).

**Claim #2. That Ram Bhagat suffers an adverse employment action of on-the-spot dismissal on 21 March 2001 by The Pennsylvania State University including Graham Spanier, Rodney Erickson, Robert Secor, Eva Pell, L. Raymond Hettche, Thomas Donnellan, Maurice F. Amateau, Timothy Eden, James Elliot, and Charles Phillips.**

<u>Evidence:</u> Exhibit B represents the letter of dismissal. Exhibit C shows the concurrence of Eva Pell for Ram Bhagat's dismissal.

**Claim #3 That the Penn State Board of Trustees fails in its oversight responsibilities to allow the administrators engage in illegal activities including race-based discrimination violating thereby (a) the academic principles of the University, (b) faculty rights, and (c) federal laws (Title VII).**

The Board has the overall responsibility for the health and welfare of the university. At stake here is the academic integrity of the university. Administrators hired by the Board of Trustees run the university. Administrators come and go. But the institution (Penn State) of higher education lives on. The university is for the students who come to learn and for the faculty who teach and conduct research. Each faculty has an intellectual equity in the university enterprise. Ram Bhagat has

a substantial equity in Penn State because of his service of seventeen years as a productive faculty.

The Board of Trustees has shown a serious indifference to the plight of Ram Bhagat and his family by failing to assert the established principles of faculty rights violated by administrators (Graham Spanier, Rodney Erickson, Robert Secor, Eva Pell and L.R. Hettche). The Board of Trustees has failed in its oversight responsibility over the top management team engaged in race-based discrimination and retaliation.

**Claim #4. That Penn State violated the due process of termination for a Standing Appointment Faculty as mandated by The Faculty Handbook (HR23).**

**Evidence:** Policy HR06 TYPES OF APPOINTMENTS states: "Standing appointment designates those appointments which are full-time and for which no ending date is specified. Such appointments are terminable only upon appropriate notice of termination in accordance with University policy." The University policy referred here is HR23 Promotion and Tenure Procedures and Regulations. Stated Purpose of HR23 is:"To determine the criteria, procedures, and conditions of the

review of University academic personnel and for the awarding of promotion and tenure". Ram Bhagat is in the category of "academic personnel" and has been promoted twice following the procedures of HR23. HR23 further states [item 14] "This policy shall apply in its entirety to all full-time regular academic personnel". Ram Bhagat is a full-time regular academic personnel. Termination procedures are the same for a tenured faculty and a standing appointment faculty:

[Excerpt from HR23 for dismissal of a tenured faculty member for adequate cause]

"ADEQUATE CAUSE:

11. A tenured faculty member may be dismissed for adequate cause (see Section IV.9). Similarly, when adequate cause exists, a tenure-eligible faculty member may be terminated without adherence to the standards of notice specified in Section IV.8. Adequate cause shall mean lack of competence or failure to perform in relation to the functions required by the appointment, excessive absenteeism, moral turpitude, or grave misconduct. Dismissal will not be used to restrain faculty members in their exercise of academic freedom or other rights of

American citizens. Standards of notice as specified in Section IV.8 are not required in cases of dismissal for adequate cause.

Ordinarily, the faculty member will be provided written notice of the alleged misconduct, and an opportunity to meet with the appropriate administrator(s) having knowledge of the alleged misconduct. If the faculty member elects to attend such a meeting, he or she will be provided an explanation of the alleged misconduct, following which the faculty member will be given an opportunity to respond.

Based on the information available after the faculty member has been given the opportunity to meet with appropriate administrator(s) having knowledge of the alleged misconduct, the matter may be resolved at this juncture. If the matter is not resolved and serious concerns remain regarding the faculty member's alleged misconduct, the cognizant Dean will consult with the Executive Vice President and Provost about the appropriateness of termination for adequate cause. If both the cognizant Dean and the Executive Vice President and Provost concur that the disciplinary sanction of termination for adequate cause is appropriate under the circumstances, the faculty member will be advised that the matter will be referred by letter from the cognizant Dean to the Chair of the Standing Joint Committee on

Tenure, unless the faculty member requests the opportunity to resign in lieu of termination.

The Dean's letter to the Standing Joint Committee on Tenure shall set forth the reasons for seeking termination of the faculty member, and the faculty member shall be provided a copy of the letter. The Standing Joint Committee on Tenure will hold a hearing to receive evidence and adjudicate the matter. Every effort shall be made to hold the hearing within sixty (60) calendar days of the date of the Dean's letter to the Committee. Suspension of the faculty member prior to a final decision by the President is justified only if there are compelling reasons to believe that harm to the University, its faculty, staff, or students will occur or be threatened by the faculty member's continued active status during the pendency of the proceedings. Any such suspension shall be with full pay and benefits.

The burden of proof for dismissing a faculty member for adequate cause shall at all times be on the University."

**Claim #5. That a warning letter was not issued to Ram Bhagat denying him the opportunity to submit a response and have a conciliation.**

**Claim #6. That Ram Bhagat considers his dismissal an act of disparate treatment (discrimination) and retaliation by the Penn State management because of his bringing up the issue of discrimination, harassment and poor work climate.**

**Claim #7. That Ram Bhagat has suffered a substantial injustice resulting from a serious violation of academic freedom (HR 64), professional ethics (AD47) and procedural fairness (HR 76).**

**Claim #8. That Ram Bhagat's dismissal is a violation of Ram Bhagat's faculty rights as described in HR 76.**

**Claim #9. That the word "insubordination" has been used with a malicious intent by the administrators.**

**Evidence #1:** The word "insubordination" does not exist in Faculty Handbook. "Insubordination" is nowhere mentioned or defined in any University policy for the faculty. As such the word "insubordination" is inappropriate and inconsistent

with the rights to academic freedom (HR 64) for a faculty in the arena of higher education; it is inapplicable to Ram Bhagat.

**Claim #10. That Ram Bhagat has been meeting the reasonable employment performance expectations for seventeen years (3 March 1984 to 21 March 2001) until the day of his illegal, wrongful dismissal.**

Ram Bhagat joins the Applied Research Laboratory of The Pennsylvania State University in March 1984 as a Research Associate. He reports to M.F. Amateau, who is then head of Engineered Materials Department.

**Evidence #1.** During the last seventeen years, Ram Bhagat is promoted to Senior Research Associate and Associate Professor of Engineering Mechanics, and to Senior Scientist and Professor of Engineering Mechanics.

**Evidence #2.** Ram Bhagat has a Standing Faculty Appointment.

**Evidence #3.** Ram Bhagat is appointed Head of Surface Technologies Department in 1998.

**Evidence #4.** Ram Bhagat's annual self-reports evaluated by M.F. Amateau have consistently ranked EXCELLENT.

**Claim #11. That Penn State's reason of Ram Bhagat's dismissal is a mere "pretext" and a cover-up for concealing the real reason of illegal discrimination and retaliation. The employer's articulated reason of insubordination for its illegal decision is malicious and false.**

**Evidence #1** The following statements of Ram Bhagat made under oath and recorded during the Unemployment Compensation (UC) hearing on 12 June 2001 [Transcript, page 60 through 69] provide clear evidence that the employer's articulated reason of insubordination is MALICIOUS and FALSE:

[Note: words in italics have been added for clarity]

**Evidence #1.1** Pertaining to the attempted theft of Ram Bhagat's patent by M. F. Amateau

**Evidence #1.1.1** "That he (*M.F. Amateau*) asked me not to communicate with the sponsors that I'm (*Ram Bhagat*) leading the projects. So I mentioned to him that

this is difficult to provide answers and that regardless of the sponsors the problems that I'm leading and not allowed to communicate data. And but he said that – well, he would do it. I should give information to him, and he will talk to the sponsor, and I...."

**Evidence #1.1.2** "Yes" to the question –"Did you give the information to Mo Amateau and let him deal with the sponsor?"

**Evidence #1.1.3** "I went on a foreign travel in October/November of '99 time frame for several weeks. When I came back from foreign travel I see on my desk signed patent papers. They were already signed by Dr. Amateau as sole and first inventor. So, I went to Dr. Amateau and said that Dr. Amateau, how could you do this to me. Now, you are not the principal or the sole inventor of this technology (*nanomaterials technology*). You know that. And also I contacted patent office, Penn State patent office from where I got that letter and all the documents. And they will not talk to me. They only say that talk to Dr. Amateau, talk to Dr. Amateau, and I simply said please explain how did this happen, you know and I need this to be corrected. And they will not talk to me, and they said well talk to Dr. Amateau, talk to Dr. Amateau, and I said I have already talked with Dr. Amateau. So, I back and forth kept talking with patent office and Dr. Amateau. I

was going nowhere, and finally late November, early December '99 I told Dr. Amateau that this needs to be corrected. And then I went to patent office, not went physically. I offered that I can come over there, but they refused to have me there. So, I told them on the phone that if this problem is not corrected, which I considered very serious, because a patent will be named as Amateau et al. when it should be Bhagat et al." "That is how the patents are worded by the first and sole inventor. So the whole world will know whom the patent really belongs to, the person named there. So, by that filings, it was to be Amateau et al., and not Bhagat et al. So I told Dr. Amateau and told the patent office that is unacceptable to me that I'm the principal inventor of this technology. So, I told them because of not getting anywhere, any response that I'm not going to sign any more documents, even if I have to lose this patent until this error is corrected. Then after several weeks, I got a call from the patent office that they are going to file corrections with the patent office in Washington, D.C., which was done several months later, and that is how it got corrected."


**Evidence #1.2** Pertaining to the plagiarism of Ram Bhagat's research results by M.F. Amateau

**Evidence #1.2.1** "I directly met with Dr. Amateau that this is my work. This is unpublished work. I am leading the work, and there are two people who are helping me in that work. None of us is listed there as a contributor, not acknowledged anywhere. And he got very, very upset, and he started saying unprofessional things to me. He was really, really mad. His glasses fell off on the floor, and then he said you (*Ram Bhagat*) get out of here. You do not belong here. A lot of nasty words, and I kind of kept quiet because he was so angered. And then he shut the door, or banged the door on me –that meeting ended there. After that I took that paper, the newsletter, which is published and I went to Dr. Donnellan and told him that I'm informing you (*Tom Donnellan*) of what Dr. Amateau had done. I will not go over you if I'm advised (*assured*) that it will stop here that no more such things will happen in the future. If I'm assured of that, I will not go any further. Dr. Donnellan assured me that he will talk to Dr. Amateau and get back to me. I also informed Dr. Paul Kurtz (ex- *Program Manager*), and Mr. Robert Cook (*Program Manager*) and Greg Johnson (*Newsletter editor*), who is the editor of that newsletter. And Greg Johnson told me. (*stopped by Referee*)."

**Evidence #1.2.2** "I got back to Dr. Donnellan and I asked him did you find out anything, and his response was I (*Tom Donnellan*) understand you are really unhappy about this. And Dr. Amateau should have been more sensitive about this,

and he assured me that such things will not happen in the future. And I said Dr. Donnellan thank you very much for your effort. I will stop here. I will not go beyond your level, and that was the end of the first plagiarized paper during the summer of 2000."


**Evidence #1.3** Pertaining the reorganization and secret take-over of Surface Technologies Department, research programs and funding


**Evidence #1.3.1** "I lost responsibility without knowing that I'm no more the head of Surface Technology Department. I was never communicated on the facility and otherwise by the Director of the lab or Dr. Amateau that I'm no more the head of Surface Technology Department. And I continued attending and getting invitation for the management meeting all the way to this year (*2001*). The 14th of March 2001 was the last meeting, the management meeting I attended just one week before I was fired. So, I kept dealing with the whole institution in the capacity of ..( *stopped by Referee*)."

**Evidence #1.4** <u>Pertaining the memos from Tom Donnellan</u>

**Evidence #1.4.1** "Okay. This memo from Dr. Donnellan is dated 14th of September, and the same day I also wrote memo, which was also 14th of September. They crossed, but before Dr. Donnellan sent his memo to me he got my memo. So, he put this sticky with a note that we are on the same page. We have elements for ..( *stopped by Referee*)"

**Evidence #1.4.2** "Numerous, numerous times" in answering "And did you (Ram Bhagat) provide those reports (*to Dr. Amateau*)?"

**Evidence #1.5** <u>Pertaining the submission of reports to Dr. Amateau</u>

**Evidence #1.5.1** "Dr. Amateau will tell me that this is not enough, and I said well do you have a specific suggestion that what it is lacking. Will you help me out? No, just go and re-do it, and then I will say well, would you like to point out the paragraph. You would like me to add some more words or language or whatever. No, no, no I don't want to be specific, just go ahead and revise this. And I said okay I will give the best shot, you know I will amplify it further. I will come back to him and hand him the revised version. He will again look around. I want to

clarify that I always gave a copy to him. So that he has a opportunity to read that before I meet with him to answer any questions he may have on that document. So, almost half a dozen times I was returned by him without any specific comments. The last meeting I had some time in January I told Dr. Amateau, I said Dr. Amateau, I cannot read your mind. I'm not a mind reader. It has become impossible for me to prepare this paper for you that you are asking. I have been a faculty here for seventeen years. You have been my supervisor. We never had this problem. This is something very unacceptable. I'm at a loss why you are doing this to me, and I consider this as harassment. This is unfair, this is unprofessional."

**Evidence #1.5.2** "On one occasion I said Dr. Amateau, please write down your comments, any comments on my documents and I'm coming back ti fill in those blanks. So, that you have everything that you want to have. He refused to do that. He said that I'm (*M.F. Amateau*) not to begin writing down what I (*M.F. Amateau*) want. And then I did say that if he did not, it is impossible for me to come back to you with another revision because I don't know where to go from here."

**Evidence #1.6** Pertaining the communication with Tom Donnellan seeking resolution

**Evidence #1.6.1**   "I went and met with him first, explaining to him in the early morning on February 5 this year (*2001*). Then I came back and wrote a memo to document what I discussed during the meeting, because this is the first time I used the word discrimination and harassment in writing. I mentioned these words on numerous occasions but orally, not in writing. And I begged him that I can't be productive, I can't function. Please help me resolve this matter. And I told him it is up to your leadership to deal with this matter at your level. So that I don't have to go to the Director of the lab. I said we are a family and we need to be taking care of this matter locally."

**Evidence #1.7** Pertaining the raw data demanded by M.F. Amateau

**Evidence #1.7.1**   "I went back to Dr. Amateau and I told him that Dr. Amateau what raw data you are talking about. And he said the data you gather in the lab; you know when you do the work. I told him that the data that I have, you have exactly the same data for the last several months. I don't get the hand written notes from the students, because they keep that for themselves. Immediately after they enter the hand-written stuff they go on the computer and use the Word, the Excel sheet or what have you. They process the data. That is what I get. That is what I transfer to Dr. Amateau. So, I did not have the actual raw data that these people –

the actual work of the technicians and the students they gather during the experiments. I said that I just don't have it. I can't give you. But I did ask him though, why do you need raw data. And he won't answer this. So, I said are you questioning the quality of the data? Are you suspecting that may be somebody has fabricated this data? So, you want to see hand-written raw data. And then he told me no, no. No, I'm not questioning that it is fabricated, but I need the raw data. I then said I just don't have it, but if you have a strong enough reason then I may have to contact the students and technicians to find where this piece of paper is. But he never gave me a reason of why that was important that I have to go back to my people, who I trusted to question where is your hand-written stuff. So, I did not get back to my students. My graduate students had already left Penn State. They are no longer here. So, I didn't feel comfortable in asking that I want to see your hand-written stuff, and I believe that they won't have it after they graduated."


**Evidence #1.8** Pertaining the communication with Tom Donnellan


**Evidence #1.8.1**  "He (*Tom Donnellan*) kept insisting that Dr. Amateau is your supervisor, you must meet his requirements. You must submit what he is asking, and he must be happy with your data. I kept telling Dr. Donnellan that it is impossible to satisfy his requirements because he did not give me any specific

direction in returning me back every time I go to give my document. And he still kept saying that well; you have to work with him (*M.F. Amateau*). That is our organizational structure; you know he is your boss. And I told him so in effect you are basically forcing me to work with somebody who is making me --- making it impossible to work. And I told him that well, you need to deal with this problem and find a reasonable solution. That's when I suggested, let's get together. So that you have all the parties at the same place, and I also said since we are directly involved, Dr. Amateau and myself may be --some emotions coming into the picture. So, just to be objective, can we have an observer from the lab not from our side and this observer would be non-technical person. I will mention the name that the lady Patty Hayes, I say well just have somebody so that somebody hears how we are talking, how we are behaving and probably that will lead to the solution, and I want to work here. I have worked for 17 years. I love this place. I'm really proud of this place. I want to work, but now it is becoming impossible. So, I beg you to resolve this problem. And that never happened."


**Evidence #1.9** Pertaining the plagiarization of Ram Bhagat's results by M.F. Amateau in Spring 2001

**Evidence #1.9.1** "On 16th of March this year 2001, I discovered a paper authored by three people, Dr. Amateau, Dr. Donnellan, and another gentleman who's still there that this paper contains the work that I'm leading. I write a fax note to Dr. Donnellan asking that this paper be withdrawn because this is again a second case of plagiarism. That happens on 16th, I talk with the secretary of Dr. Donnellan and make sure that she received the fax. I also asked her to please keep it upside-down so that no body else sees this and hand it to Dr. Donnellan, and please ask him to give me a call when he receives this document. Not getting any call from Dr. Donnellan for several hours, toward the late in the evening on that day 16th, I called back to confirm Dr. Donnellan did you receive my fax. He said yes. I said well is it going to be withdrawn? His answer was –Dr. Amateau –he said that he has talked about this with Dr. Amateau, and Dr. Amateau had a different opinion. I asked him, can he elaborate. He refused to elaborate. He continued that Dr. Amateau had a different opinion."


**Evidence #2** Andrea Commaker submits a bundle of lies to the EEOC, Philadelphia on 5 November 2001 in response to Ram Bhagat's complaint. In response to the EEOC request Ram Bhagat submits a document on 24 April 2002 (Exhibit D) identifying a TOTAL OF SIXTY-SEVEN FALSE STATEMENTS made by the Penn State Administrators. The EEOC, finding the employer's

explanation unworthy of credence, schedules a conciliation meeting. Robert Secor, Eva Pell and L.R. Hettche submit statement in lieu of their physical presence at the conciliation meeting in Philadelphia on 10 July 2002.

**Evidence #3** In his letter of June 10, 2002 to EEOC, Philadelphia Robert Secor writes "I referred him (*Ram Bhagat, added for clarification*) to the Senate Committee on Faculty Rights and Responsibilities" (Exhibit E). That is right; he also asserted in his email to Ram Bhagat that <u>the Senate Committee on Faculty Rights and Responsibilities (FRR) is indeed the appropriate committee to examine Ram Bhagat's grievances</u>. This is what Ram Bhagat has known all along for seventeen years at Penn State.

"...he (*Ram Bhagat*) does have the right to appeal his termination to the Faculty Rights and Responsibilities Committee pursuant to Penn State policy HR-76..", states Thomas Donnellan in his letter of 23 pril 2001 to the unemployment compensation office.

Ram Bhagat meets with James Rambeau, the then Chair of the FRR Committee. He asks Ram Bhagat to send the petition to each of the nine committee members. All the committee members receive Ram Bhagat's petition. They meet and discuss the petition (Exhibit F). And until then no one has raised any question whether that

is the right Committee to consider the petition. Eva Pell happens to be an ex-officio member of the Committee. She does not attend the Committee meeting; there are charges against her in the petition, which she knows because she has received the petition before the meeting.

After several weeks Ram Bhagat is informed that the FRR Committee does not have the jurisdiction to examine his petition (Exhibit G).  James Rambeau declines to offer Ram Bhagat a reason and declines to suggest which Committee the petition belongs to. THIS IS A MASSIVE COVER-UP BY THE PENN STATE ADMINISTRATORS INCLUDING THE OFFICE OF THE PRESIDENT BECAUSE THE FRR COMMITTEE IS ADVISORY TO THE OFFICE OF THE PRESIDENT.

Ram Bhagat expresses his disappointment to Robert Secor and asks if he will help schedule a meeting with the President (Graham Spanier). Robert Secor replies that is not possible; the doors are closed on Ram Bhagat by a malicious intent of Graham Spanier, Rodney Erickson, Robert Secor, and Eva Pell. See Exhibits H and I. Such an act of malicious, egregious, and outrageous misconduct on the part of upper management puts the great name of Penn State to shame. And the Board of Trustees keeps quite. The Board shows utter indifference to the reputation of

Penn State and the plight of a faculty member who has been punished with dismissal without any legitimate reason. Administrators come and go. The conscience of this great university cannot be stolen by a band of man and women no matter how evil and egregious their conducts are.


**Evidence #4** Eva Pells' assertion "I concluded that Dr. Bhagat had indeed been unresponsive and obstructionistic to the reasonable requests of his superiors" in her letter of 7 June 2002 to EEOC, Philadelphia (Exhibit J) is totally baseless. Her conclusion is a lie because Ram Bhagat was not unresponsive to the requests of his superiors. M.F. Amateau, Tom Donnellan, L.R. Hettche conspire along with her and Chuck Phillips and James Elliott to fabricate a reason to make Ram Bhagat insubordinate and fire him. That is what they accomplish on 21 March 2001 by dismissing Ram Bhagat on the spot. Further assertion of Eva Pell "Also Dr. Bhagat had been given fair warning that disciplinary action of this type would be taken against him, if he did not address the serious concerns brought to his attention numerous times" is totally FALSE. Penn State has not provided Ram Bhagat a warning letter as required by the Faculty Handbook. And what "concerns" she is alluding to? Whose concerns? About what? And for what? Ram Bhagat has served Penn State very well for seventeen years. It is Ram Bhagat's concerns that get ignored and Ram Bhagat gets retaliated with her malicious and illegal concurrence.

Did she want to hear Ram Bhagat's side if she heard something against him? No, she did not want that. She did not want to know the truth. Where did she look for evidence before asserting, "...I found no evidence of discrimination..." excerpted from the same letter of 7 June 2002? She did not look for evidence. Instead she orders the Affirmative Action Office to close the book on Ram Bhagat's complaint. And they listen; Carmen Borges agrees with her boss. The Board of Trustees shows no concern for such illegal and outrageous activities of Eva Pell in collusion with the Office of the President.

**Evidence #5** L. Raymond Hettche states in his letter of June 20, 2002 to EEOC (Exhibit K) "...Ram Bhagat, who had been head of the Division's Surface Engineering Department, which would no longer exist under the new Materials Processing Division." This is untrue. Ram Bhagat remains the head of Surface Engineering Department until the day he is dismissed. L.R. Hettche's realignment (Exhibit L) does not make any changes to or for the Surface Technologies (correct) Department; Ram Bhagat attends the monthly management meetings every month in the capacity of a head of department after the realignment including the month of his dismissal. Facts are M.F. Amateau secretly takes over the Surface Technologies Department, takes over Ram Bhagat's research programs, and

reassigns engineers working with Ram Bhagat all without Ram Bhagat's knowledge until he finds out just one week before his dismissal. M. F. Amateau fabricates a document, which does not show the existence of the Surface Technologies Department and includes in Ram Bhagat's personnel file on 29 March 2001; the dismissal takes place on 21 March 2001. At the unemployment compensation hearing (12 June 2001) Penn State lawyer submits a doctored Laboratory Organization chart dated March 2001; the actual date of the month is missing. This is a fraudulent chart which doenot list Surface Technologies Department; the chart is fabricated after Ram Bhagat's wrongful termination on 21 March 2001. These malicious and outrageous acts are illegal and fraudulent. How could this happen? Again M.F. Amateau, Tom Donnellan and L.R. Hettche conspire to engineer a malicious and illegal scheme to make Ram Bhagat insubordinate and use that a pretext to fire him. That is what they succeed in doing without L.R. Hettche ever talking to Ram Bhagat about his complaints of discrimination and harassment by M.F. Amateau, Tim Eden and Tom Donnellan. L.R. Hettche is recalcitrant to the mandates of university policies and federal laws (Title VII) in making a race-based illegal decision to dismiss Ram Bhagat.

**Evidence #6** Four major fraudulent misconducts of M.F. Amateau amounting to illegal disparate treatment (discrimination) of Ram Bhagat causing a tremendous emotional distress for him and his family

**Evidence #6.1.**First Principal Misconduct of M. F. Amateau [Fall 1999]: M.F. Amateau engineers a conspiracy to take over the ExoFlash patent of Ram B. Bhagat in the area of nanostructured materials technology. Patent application originally filed in November/December 2000 with the United States Patent Office, Washington, DC contain signatures of M.F. Amateau as the FIRST and SOLE inventor. Ram Bhagat listed as the joint inventor requests correction. The corrections are made in four months.

**Evidence #6.2** Second Principal Misconduct of M. F. Amateau: In Summer 2000 R. Bhagat submits an invention disclosure "A Materials Solution to Nozzle Clogging in Thermal Spray" to S. Andrews. M.F. Amateau directs S. Andrews not to process R. Bhagat's invention disclosure. R. Bhagat learns that M.F. Amateau wants to take credit for the invention disclosure denying any credit to R. Bhagat.

**Evidence #6.3** Third Principal Misconduct of M.F. Amateau: M. F. Amateau plagiarizes R. Bhagat's research results in presentations and publications (at least 2).

M.F. Amateau asks R. Bhagat for research results on projects led by R. Bhagat. M.F. Amateau gets the requested information electronically. M. F. Amateau and T. Eden also get additional information from D. Stiver, an engineer working with R. Bhagat. The results are published in an article co-authored by M.F. Amateau and T. Eden without even acknowledging R. Bhagat, A. Papyrin and D. stiver for their results. R. Bhagat complains about this act of plagiarism in Summer 2000.

During the Unemployment Compensation (UC) hearing M.F. Amateau states under oath [Transcript page 21]: "My name is not on this article and I'm not the prime author of this article. My name was put on this article by the editor of the newsletter."

The above statement is FALSE. Plus the editor has told Ram Bhagat that M.F. Amateau submitted the article to him. The co-author Tim Eden has apologized to Ram Bhagat and has admitted that M.F. Amateau used Ram Bhagat's results in the publication.

In March 2001, M.F. Amateau and T. Eden plagiarize work led by R. Bhagat for a conference presentation/publication. R. Bhagat sends a fax to T. Donnellan in this matter asking him for the withdrawal of the plagiarized paper before it is published. T. Donnellan ignores R. Bhagat's request.

**Evidence #6.4** <u>Fourth Principal Misconduct of M.F. Amateau</u>: M. F. Amateau steals R. Bhagat's idea of aluminum nanocomposites and submits a proposal to DARPA without the knowledge of R. Bhagat.

R. Bhagat submits an issue paper (similar to a pre-proposal) on aluminum nanocomposites to Marine Corp. for ManTech funding. The issue paper is ranked very high by the sponsor's proposal evaluation team. M.F. Amateau steals R. Bhagat's idea of developing aluminum nanocomposites (involving ExoFlash technology, patent pending) and submits a concocted proposal to DARPA without the knowledge of R. Bhagat.

**Evidence #7** <u>Eighteen Retaliatory Illegal Misconducts of M.F. Amateau et al.</u> <u>causing tremendous emotional distress to R. Bhagat and his family</u>

**Evidence #7.1** Retaliatory Misconduct #1 of M.F. Amateau [Spring 2000]: Ram Bhagat submits an application package for the position of Associate Director of Materials and Manufacturing Office at ARL on 10 February 2000. M.F. Amateau's position requires him to report to the successful candidate. Ethics require M.F. Amateau not to participate in the hiring process because Ram Bhagat (who reports to M.F. Amateau) is a candidate. Instead, he conspires to sabotage Ram Bhagat's application successfully. This violates Policy HR01 Fair Employment Practices and HR11 Affirmative Action in Employment. Ram Bhagat considers this a case of discrimination and intolerance (refer to Policy AD29 and AD42). Tom Donnellan is hired to fill the vacancy. M.F. Amateau reports to Tom Donnellan.

R. Bhagat is denied equal access to employment for a new position because of R. Bhagat's national origin. Plus professional ethics and procedural fairness have been violated.

**Evidence #7.2** Retaliatory Misconduct #2 of M.F. Amateau [Spring 2000]: M.F. Amateau asks Ram Bhagat not to communicate with (a) the sponsors of ongoing research programs led by Ram Bhagat and (b) the potential new sponsors in the areas of expertise of Ram Bhagat such as nanostructured materials and coatings.

R. Bhagat is denied equal privileges or treatment in being prevented by M.F. Amateau from communicating with sponsors because of R. Bhagat's national origin.

**Evidence #7.3** Retaliatory Misconduct #3 of M.F. Amateau in collusion with Tim Eden: M.F. Amateau and Tim Eden (a research associate) impose restrictions to Ram Bhagat on the use of research facilities and human resources. This seriously and adversely affects Ram Bhagat's effective performance. The work climate deteriorates affecting the morale and performance of several employees working with R. Bhagat.

**Evidence #7.4** Retaliatory Misconduct #4 of M.F. Amateau [Summer 2000]: M.F. Amateau does not release overhead money to the Surface Technologies Department headed by Ram Bhagat. Other department Heads receive the allotted overhead money. Upon Ram Bhagat's enquiry in this matter, M.F. Amateau directs Ram Bhagat to come to M.F. Amateau as and when overhead money is needed.

Ram Bhagat considers this act of M.F. Amateau discriminatory. This also adds to the continuing harassment and poor work climate faced by Ram Bhagat.

**Evidence #7.5** Retaliatory Misconduct #5 of M.F. Amateau in collusion with L.R. Hettche, Tom Donnellan and Tim Eden [Summer 2000]: M.F. Amateau secretly takes over all the projects of the Surface Technologies Department. He creates a fictitious Materials Processing Department and assigns himself as the Head of that department (which in reality is the Surface Technologies Department). This is kept secret because M.F. Amateau is the Head of a division named Materials Processing. Director's memo (see Exhibit L) pertaining the reorganization of ARL in Summer 2000 does not include any directive affecting the Surface Technologies Department. Unaware of M.F. Amateau's conspiracies, Ram Bhagat stays Head of the Surface Technologies Department and in that capacity he attends management meetings (chaired by L.R. Hettche) including the meeting on 14 March 2001, just one week before his dismissal on 21 March 2001. Until R. Bhagat's on-the-spot, retaliatory, wrongful dismissal on 21 March 2001, R. Bhagat corresponded with upper management (L.R. Hettche, T.M. Donnellan, M.F. Amateau, and others) as the Head of Surface Technologies Department.

This misconduct of M.F. Amateau, L.R. Hettche, Tom Donnellan, and Tim Eden constitutes a serious case of fraud and race-based discrimination against Ram Bhagat.

**Evidence #7.6** <u>Retaliatory Misconduct #6 of M.F. Amateau in collusion with L.R. Hettche, Tom Donnellan and Tim Eden [September/October 2000]</u>: Ram Bhagat leads an effort to establish a multi-million dollar research program in the area of wear and corrosion resistant coatings. He plans a meeting for October 19 to be attended by several key people from Govt. and industry. M.F. Amateau conspires with Tom Donnellan to sabotage Ram Bhagat's opportunity to develop a multimillion-dollar business for the Applied Research Laboratory. Ram Bhagat is directed to disengage himself from this effort without giving proper justifications. M.F. Amateau takes over.

These outrageous actions of L.R. Hettche, Tom Donnellan and M.F. Amateau violate Ram Bhagat's academic freedom and professional ethics in the pursuit of technological leadership and rob Ram Bhagat of his potential business opportunities from Govt. and industry.

R. Bhagat is denied equal privileges or treatment by M.F. Amateau, L.R. Hettche, and Tom Donnellan in building a strong research program for the Surface Technologies Department because of R. Bhagat's national origin.

**Evidence #7.7** <u>Retaliatory Misconduct #7 of M.F. Amateau in collusion with L.R.</u> <u>Hettche, Tom Donnellan and Tim Eden [Fall 2000]</u>: M.F. Amateau and Tim Eden create numerous roadblocks for Ram Bhagat for the research projects led by Ram Bhagat (see Exhibit M).

**Evidence #7.8** <u>Retaliatory Misconduct #8 of M.F. Amateau. M.F. Amateau</u> <u>prevents R. Bhagat from hiring an engineer (trained and budgeted in a funded</u> <u>project led by R. Bhagat).</u>

Surface Technologies Department has an open position (approved by Director) for an engineer to work in the area of nanomaterials technology. Suitable external candidates are not available. Ms. M. Sharma, an engineer with M.S. degree and completing Ph.D. in Summer 2000, is hired on wage payroll to work on the project. She is budgeted in a ManTech program, which has been approved and funded. R. Bhagat submits paperwork to M. Amateau for hiring Ms. M. Sharma on a one year fixed-term starting 1 January 2001. M.F. Amateau refuses to approve hiring Ms. Sharma without offering any specific reason.

R. Bhagat is denied equal privileges or treatment by M.F. Amateau in building human resources for the Surface Technologies Department because of R. Bhagat's national origin.

**Evidence #7.9** Retaliatory Misconduct #9 of M.F. Amateau in collusion with L.R. Hettche, Tom Donnellan and Tim Eden to humiliate Ram Bhagat [November 2000]: M.F. Amateau conspires with the upper management wherein Ram Bhagat, a Senior Scientist and Professor of Engineering Mechanics, has to report to Tim Eden, a Research Associate. Tim Eden received his Ph.D. in 1999. This reporting requirement (see Exhibit N) is against all the established rules of the university for academic faculty.

Ram Bhagat considers this misconduct of M.F. Amateau, Tom Donnellan, and L.R. Hettche_a serious case of discrimination, harassment, and intolerance. Their malicious intent appears to be tearing down Ram Bhagat such that he leaves ARL thereby facilitating M.F. Amateau's takeover of Ram Bhagat's research enterprise.

**Evidence #7.10** Retaliatory Misconduct #10 of M.F. Amateau in collusion with L.R. Hettche, Tom Donnellan and Tim Eden [January/February 2001]: M.F. Amateau conspires with Tom Donnellan to freeze Ram Bhagat's project on High

Rate Machining of Titanium Blisks and Disks with a budget of $1.2 M for three years; $350 K for FY01. The project is transferred secretly to Tim Eden.

R. Bhagat is denied equal privileges or treatment by M.F. Amateau denying access to the funds for the project led by R. Bhagat because of R. Bhagat's national origin.

**Evidence #7.11** Retaliatory Misconduct #11 of M.F. Amateau: M.F. Amateau takes over R. Bhagat's funded projects secretly and illegally.

R. Bhagat is the PI on four funded projects:

a.  High Rate Machining of Ti Blisks and Disks (A0974)

b.  Titanium Machining Improvements for the Tomahawk Engine (A0890)

c.  Cold Gas Dynamic Spraying of Wear Resistant Coatings for Aircraft Carrier Catapult Pistons (A0950)

d.  Advanced Manufacturing Process for AAAV Roadwheels (C0900)

In collusion with T.M. Donnellan and accounting personnel, M.F. Amateau takes over the abovementioned four projects without the knowledge of R. Bhagat. R. Bhagat finds this out in March 2001 just two or three days before his dismissal..

This is a disparate treatment (discrimination) for Ram Bhagat and it is fraudulent.

**Evidence #7.12** Retaliatory Misconduct #12 of M.F. Amateau: M.F. Amateau Squeezes out R. Bhagat (Co-PI) from two funded projects ($750K and $150K).

R. Bhagat develops a major industrial project with M.F. Amateau for the Surface Technologies Department headed by R. Bhagat. After the proposal is developed M.F. Amateau designates himself as the PI and R. Bhagat as the Co-PI. M.F. Amateau also adds T. Eden as a Co-PI on the proposal though the proposed work is not in the area of T. Eden's expertise. The proposal is funded with a budget of $750 K for a period of 22 months. The project is included in the Surface Technologies Department. In about two months after the start of the work on the project, M.F. Amateau and T. Eden eliminate R. Bhagat's responsibility transferring the project to Metals and Ceramics Department headed by T. Eden. The project is later cancelled because the sponsor lacked confidence in the technical capabilities of M.F. Amateau and T. Eden. The project was funded on the foundation that A. Papyrin (inventor of the cold gas dynamic spray technology, member of Surface Technologies Department) and R. Bhagat (Co-PI) were to fully

participate in the performance on the project. A. Papyrin resigned. R. Bhagat was squeezed out of the project.

This is a serious case of disparate treatment (discrimination) against Ram Bhagat. It also hurts the reputation of the lab and the university in addition to financial loss.

**Evidence #7.13** Retaliatory Misconduct #13 of M.F. Amateau: M. F. Amateau sabotages R. Bhagat's two pre-proposals to NSF in the area of nanomaterials technology.

R. Bhagat submits two collaborative pre-proposals for NSF funding to the screening committee organized by Associate V.P. for Research. M. F. Amateau serves on this committee. Since R. Bhagat reports to M.F. Amateau, professional ethics require M.F. Amateau not to participate in reviewing R. Bhagat's pre-proposals. But M.F. Amateau does participate and R. Bhagat's pre-proposals are not selected by the committee.

R. Bhagat is denied equal privileges or treatment by M.F. Amateau preventing R. Bhagat from competing for research funds from National Science Foundation because of R. Bhagat's national origin.

**Evidence #7.14** Retaliatory Misconduct #14 of M.F. Amateau: M.F. Amateau sabotages R. Bhagat's efforts in developing research programs with Praxair and BOC Gases.

R. Bhagat establishes significant understanding with the representatives of Praxair and BOC Gases to develop collaborative research in the area of coatings with an emphasis on cost reduction by employing their technologies for helium recycling and powder recycling. Productive meetings take place at ARL with the representatives of Praxair and BOC Gases. The work is to be led by R. Bhagat in Surface Technologies Department. Proprietary information disclosure agreements are signed. Following this M.F. Amateau stops R. Bhagat from developing research proposals with Praxair and BOC Gases saying that he has assigned T. Eden to be the lead. [Outcome: Praxair and BOC Gases loose confidence in doing business with M.F. Amateau and T. Eden; they (Praxair and BOC Gases) backed off. It is a tremendous blow to ARL both in terms of prestige and business opportunity.]

R. Bhagat is denied equal privileges or treatment by M.F. Amateau in developing new industrial programs for the Surface Technologies Department because of R. Bhagat's national origin.

**Evidence #7.15** Retaliatory Misconduct #15 of M.F. Amateau in collusion with L.R. Hettche, Tom Donnellan and Tim Eden [February 2001]: Tim Eden issues a note (see Exhibit O) to Ram Bhagat on how he (Eden) is going to exercise his power and authority to essentially tear down Ram Bhagat. M.F. Amateau fully supports Tim Eden in this endeavor.

**Evidence #7.16** Retaliatory Misconduct #16 of M.F. Amateau in collusion with L.R. Hettche and Tom Donnellan: M. F. Amateau conspires with V. Fishman to market nanomaterials technology in the name of M. Amateau, though R. Bhagat is leading the technology.

R. Bhagat is leading and championing the nanomaterials technology (patent pending). In Fall 2000 M.F. Amateau asks R. Bhagat to provide V. Fishman technical information on the nanomaterials technology for developing a marketing document. But, secretly, M.F. Amateau asks V. Fishman to list M.F. Amateau as the point-of-contact for the nanomaterials technology. M. F. Amateau is listed as

the point-of-contact. R. Bhagat finds this out on 14 March 2001 during the management meeting just one week before his dismissal on 21 March 2001.

R. Bhagat is denied equal privileges or treatment by M.F. Amateau's conspiracy to designate himself as the point-of-contact for a technology led by R. Bhagat because of R. Bhagat's national origin.

**Evidence #7.17** Retaliatory Misconduct #17 of M.F. Amateau in collusion with L.R. Hettche, Tom Donnellan, and T. Eden: M. F. Amateau interferes in the approved research plans. Demands numerous revisions to plans for the ongoing and new initiative (led by R. Bhagat) without giving a written comment.

Starting Fall 2000 M.F. Amateau asks R. Bhagat for detailed research results on projects led by R. Bhagat. This is very unusual. R. Bhagat asks M.F. Amateau about what he intended to do with the research results. M.F. Amateau refuses to give a specific reason or purpose. R. Bhagat gives M. F. Amateau requested information in electronic form (as desired by M. Amateau). M. Amateau (joined by T. Eden) asks for revisions of research plans (prepared and led by R. Bhagat) without being specific about what changes he wants except commenting that he needs more details. This becomes exasperating; R. Bhagat tells M. Amateau that R.

Bhagat can not read M. Amateau's mind as such the latter should write down what he wants so that R. Bhagat will fill in the blanks. M. Amateau refuses to give any written comment. R. Bhagat considers this harassment and conveys this to M. F. Amateau. The harassment continues. R. Bhagat meets with T. Donnellan on 5 February 2001 in this matter requesting him to look in the deteriorating work climate at the CATO facility, discrimination and harassment faced by R. Bhagat.

This misconduct violates Ram Bhagat's faculty rights of Academic Freedom, Professional Ethics, and Procedural Fairness. Ram Bhagat suffers Discrimination, Harassment, and Poor Work Climate

**Evidence #7.18** Retaliatory Misconduct #18 of M.F. Amateau. M. F. Amateau ignores R. Bhagat's concerns of discrimination, harassment and poor work climate.

R. Bhagat reminds M.F. Amateau on numerous occasions about the deteriorating work climate at CATO facility of ARL. R. Bhagat asks M.F. Amateau to stop acts of discrimination and harassment. R. Bhagat's concerns are ignored by M.F. Amateau.

Discrimination, Harassment and Poor Work Climate: A quote from Policy AD47 Statement on Nondiscrimination and Harassment—"It is the policy of the University to maintain an academic and work environment free of discrimination, including harassment". M.F. violated this policy by ignoring R. Bhagat's concerns of discrimination, harassment and poor work climate.

**Evidence #8 Ram Bhagat makes informal (internal to ARL) complaint against M.F. Amateau to Tom Donnellan seeking resolution. In retaliation Penn State fabricates a "pretext" of insubordination. Ram Bhagat is dismissed.**

**Evidence #8.1** T. Donnellan commits race-based discrimination against Ram Bhagat [February/March 2001]: Ram Bhagat meets with Tom Donnellan and subsequently Chuck Phillips (HRO) informing them of the discrimination, harassment and poor work climate. Ram Bhagat's concerns are ignored.

A quote from Policy AD42—"The University will make every effort to promptly investigate and resolve complaints of discrimination or harassment, with due regard for fairness and the rights of both the complainant and alleged offender, and to conduct all proceedings in the most confidential manner possible.

Any member of the University community who experiences discrimination or harassment should immediately report the incident to the Affirmative Action Office, an administrator in his or her department or unit, or the Office of Human Resources. In cases where an individual reports alleged discrimination or harassment to an administrator, faculty member, or staff member, the person receiving the complaint should contact the Affirmative Action Office to discuss resolution and ensure consistent responses to issues across units."

T. Donnellan violates the above policy for resolution of complaints by R. Bhagat. He commits discrimination against Ram Bhagat because of Ram Bhagat's national origin.

**Evidence #8.2** T.M. Donnellan conspires with M.F. Amateau, C. Phillips, James Elliott, and L.R. Hettche to retaliate.

Without any effort to conciliate, T. Donnellan asserts that there is no discrimination. He plans to retaliate in collusion with M.F. Amateau, C. Phillips, James Elliott, and L.R. Hettche. This becomes obvious by his refusal on 20 March 2001 to receive revised document from R. Bhagat.

A quote from Policy AD47 Statement on Nondiscrimination and Harassment—
"The University prohibits retaliation against anyone who files a complaint and/or
participates in an investigation involving alleged discrimination or harassment".
T.M. Donnellan, M.F. Amateau, C. Phillips, James Elliott, and L.R. Hettche
violate this policy.

**Evidence #8.3** <u>T.M. Donnellan conspires to invite R. Bhagat for a meeting to
discuss R. Bhagat's concerns with C. Phillips. But at the meeting (March 21, 2001)
R. Bhagat is asked to resign or get dismissed.</u>

On 21 March 2001 in the presence of Tom Donnellan, Chuck Phillips states that he
is authorized by the Director (L.R. Hettche) to ask Ram Bhagat to pick one of the
two options: 1. Resign effective March 21 citing personal reasons and signing a
letter not to sue Penn State. ARL will pay three months' salary. 2. Get dismissed
effective March 21. ARL will pay one month's salary. Ram Bhagat does not see a
valid reason to resign. He is dismissed on the spot (orally). Ram Bhagat is told he
is dismissed because of his insubordination to his supervisor (M.F. Amateau) and
also to Tom Donnellan (M.F. Amateau's supervisor).

The formal letter of dismissal, issued the next day (22 March 2001), does not include the word "insubordination" (see Exhibit B).

**Evidence #9 Ram Bhagat faces numerous acts of Post-Dismissal Retaliation. University Policies are violated in a high-level administrative cover-up. The Board of Trustees fails in its oversight responsibilities. Ram Bhagat's request for reinstatement is ignored. Ram Bhagat still stays "Penn State Proud".**

**Evidence #9.1** Eva Pell supports wrongful termination. No valid cause, no formal warning of termination.

On March 22, Ram Bhagat meets with Eva Pell. The next day E. Pell issues a letter supporting the dismissal (see Exhibit C). This is wrong. Eva Pell did not wait for Ram Bhagat's document (providing a chronology of major events leading to the wrongful termination on March 21) that she knew it was coming on Monday, March 26. She did get this document on March 26 (Monday). According to C. Phillips the dismissal decision is pre-approved by Eva Pell. She commits a blunder and does not want to reconcile fearing the truth will be in favor of R. Bhagat.

**Evidence #9.2** <u>Eva Pell's illegal interference with AAO by copying memo of March 23 to B. Ortiz</u>

In her memo of March 23 supporting the wrongful dismissal of R. Bhagat, E. Pell states that there is no evidence of discrimination. She copies this memo to B. Ortiz of Affirmative Action Office. This is administrative interference of the independent investigation of discrimination by AAO.

<u>Discrimination:</u> A quote from Policy AD47 or AD42 Statement on Nondiscrimination and Harassment—"The University will make every effort to promptly investigate and resolve complaints of discrimination or harassment, with due regard to fairness and the rights of both the complainant and alleged offender, and to conduct all proceedings in the most confidential manner possible." E. Pell violates this policy in concluding that there is no discrimination and in sending her memo to B. Ortiz.

Ram Bhagat files a formal complaint with the Affirmative Action Office (AAO) on 22 March 2001 pursuant to Policy AD 42 Statement on Nondiscrimination and Harassment. Carmen Borges asserts that the AAO will never go against the desire of the administration. This is a serious administrative fraud involving Graham

Spanier, Rodney Erickson, Robert Secor and Eva Pell. The Board of Trustees has a responsibility to look into the fraudulent activities of AAO in collusion with upper management. Administrative abuse of AAO must stop.

**Evidence #9.3** C.P. Phillips corrupts R. Bhagat's personnel file by adding numerous memos from T. Donnellan and M.F. Amateau after the dismissal without R. Bhagat's concurrence or an opportunity to append a statement

C. Phillips includes numerous memos to R. Bhagat's personnel file after R. Bhagat's inspection of his personnel file on 2 April 2001. This violates the requirements of Penn State policy HR60 and it is fraudulent.

Violation of Procedural Fairness: A quote from HR60 Access to Personnel Files—
" A personnel file should contain only that information which is relevant to the employee's status and performance as an
employee and to the commitment made to and by him/her -- i.e., only that information which the University is required to know for the performance of valid and necessary University functions. No other information should be included without the agreement of the employee concerned, except at his/her own initiative. If unsolicited material pertaining to an employee is included in the subject's file, as

49

relevant, the employee should be informed that it has been so included. The employee shall have the right to append signed personal statements to any material in this file concerning its accuracy, relevancy, or applicability."

Discrimination: R. Bhagat is denied equal privileges or treatment in not getting notified by the Human Resources Office about the addition of memos in the personnel file in a timely manner because of R. Bhagat's national.

**Evidence #9.4** L.R. Hettche admits his mistake of dismissing Ram Bhagat. On 29 May 2001 Ram Bhagat meets with L. R. Hettche and requests reinstatement. His answer **"If I reinstate you that will amount to admitting our mistake"** says a volume about his malicious and fraudulent intent and his egregious and recalcitrant misconducts violating university policies and federal laws (Title VII).

**Evidence #9.5** Under oath, Tom Donnellan and C. Phillips admit at the UC hearing on 12 June 2001 that they did not investigate R. Bhagat's complaints of discrimination, harassment, and poor work climate. This is a serious dereliction of their duties and is a violation of university policies.

**Evidence #9.6** Penn State continues post-dismissal retaliation to destroy Ram Bhagat's career and family by ARL's refusal to give recommendation letters for job opportunities as communicated by Penn State's lawyer Katherine Allen.

**Evidence #9.7** Under the direction of Eva Pell, Ron Huss conspires to corrupt the contents of Ram Bhagat's invention and patent, threatens to abandon the patent, and attempts to get Ram Bhagat's signature FIRST on a conspiratorial document that makes the patent worthless to any potential investors for commercialisation. Ron Huss directly reports to Eva Pell.

Frank Wojnicki leaves Penn State under dubious circumstances after Ram Bhagat brings up the issue of attempted theft of his patent by M.F. Amateau in cohort with Frank Wojnicki. Timing is of essence here. It appears that Eva Pell has understood that Ram Bhagat has been right all along for charging M.F. Amateau for attempted theft of patent and invention disclosure, and plagiarism, and subsequent acts of retaliatory discrimination and harassment. The Board of Trustees must see the seriousness of such rampant corruptions pervading the university and take appropriate actions to clean the system for the greater good of the institution. Will they rise up to the challenge?

In summary, Ram Bhagat presents overwhelming evidence to prove that Penn State's explanation of insubordination is MALICIOUS and FALSE. The "insubordination" cause has been used as a "pretext" to evade the real reason of race-based discrimination and retaliation upon R. Bhagat filing a formal complaint of discrimination, harassment, and poor work climate on 13 March 2001. The swiftness and the ferocity of the retaliation – dismissal (the "capital punishment" of one's career) without due process, in just a week after the complaint – is designed to intimidate employees who dare not file a complaint of discrimination at Penn State. Ram Bhagat is Penn State proud.

12-12-2002

*R Bhagat*

Ram B. Bhagat
2302 Oak Leaf Drive
State College, PA 16803
(814) 238-3584

T. O. C

## Exhibits

**Table of Contents**

A.  Notice of Right to Sue within 90 days, September 16, 2002
B.  Letter of Dismissal, March 22, 2001
C.  Letter from Eva J. Pell, March 23, 2001
D.  Ram Bhagat's letter to EEOC, April 24, 2002
E.  Statement of Robert Secor, June 10, 2002
F.  Letter from James Rambeau, April 19, 2001
G.  Letter from James Rambeau, May 17, 2001
H.  Email from Robert Secor, March 28, 2001
I.  Email from Rodney Erickson, March 29, 2001
J.  Statement of Eva J. Pell, June 7, 2002
K.  Statement of L. Raymond Hettche, June 20, 2002
L.  Email from Richard Stern on Laboratory Realignment, June 20, 2000
M.  Ram Bhagat's four research projects at the time of dismissal
N.  Organization of Materials Processing Division, November 15, 2000
O.  Notes from Tim Eden, February 2, 2001



**U.S. Department of Justice**

Civil Rights Division

*Exh. A*

NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

CERTIFIED MAIL
3508 5350

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

September 16, 2002

Dr. Ram B. Bhagat
2302 Oak Leaf Dr.
State College, PA  16803

Re:  EEOC Charge Against Penn State University, Applied Research Lab, et al.
     No. 17FA13350

Dear Dr. Bhagat:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice. If you cannot afford or are unable to retain an attorney to represent you, the Court may, at its discretion, assist you in obtaining an attorney. If you plan to ask the Court to help you find an attorney, you must make this request of the Court in the form and manner it requires. Your request to the Court should be made well before the end of the time period mentioned above. A request for representation does not relieve you of the obligation to file suit within this 90-day period.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                    Sincerely,

                    Ralph F. Boyd, Jr.
                Assistant Attorney General
                  Civil Rights Division

        by      *Karen L. Ferguson*

                    Karen L. Ferguson
                    Civil Rights Analyst
                Employment Litigation Section

cc:  Philadelphia District Office, EEOC
     Penn State University, Applied Research Lab, et al.





PENN STATE

*Exh. B*

Applied Research Laboratory

The Pennsylvania State University
P.O. Box 30
State College, PA 16804-0030

(814) 865-6373
Fax: (814) 865-1615

March 22, 2001

Dr. Ram B. Bhagat
2302 Oak Leaf Drive
State College, PA 16803

Dear Dr. Bhagat:

The purpose of this letter is to confirm the substance of our meeting with you on Wednesday, March 21, 2001. In attendance at the meeting on behalf of the University was Dr. Thomas M. Donnellan and Mr. Charles P. Phillips, Jr.

The purpose of this meeting was to inform you that effective March 21, 2001, your employment with the Applied Research Laboratory is terminated. This action is the result of your continued refusal, at the direction of Dr. Donnellan, to communicate with your immediate supervisor, Dr. Maurice F. Amateau.

Please commence the termination checkout procedure (attached) today beginning with a security debriefing. The remainder of the checkout procedure should be completed not later than close of business on Friday, March 23, 2001. You will be retained in a pay status through April 20, 2001.

You should contact Arlene H. Liddy in my office to discuss continuation of benefits.

Sincerely,

Charles P. Phillips, Jr.
Assistant to the Director for Human Resources

# PENNSTATE

*Exh. C*



Eva J. Pell
Vice President for Research
Dean of the Graduate School
Steimer Professor of Agricultural Sciences

The Pennsylvania State University
304 Old Main
University Park, PA 16802-1504

(814) 863-9580
Fax: (814) 863-9659
E-mail: ejp@psu.edu

March 23, 2001

Dr. Ram Bhagat
2302 Oak Leaf Drive
State College, PA 16803

Dear Dr. Bhagat:

I appreciate you visiting with me on the afternoon of Thursday March 22, 2001 to discuss your recent notice of termination by the Applied Research Laboratory. Since that time I have met with a variety of individuals including members of ARL administration, human resources, the Provost's office and legal counsel.

After reviewing all the facts I have found no reason to reverse the decision made by the Applied Research Laboratory. In my judgment, the reasons for termination of your employment were legitimate and nondiscriminatory in nature. You had been given fair warning that disciplinary action of this type would be taken against you, if you did not address the serious concerns brought to your attention numerous times. As such, I request that you immediately meet with Chuck Phillips to arrange for the appropriate security debriefing and return of any and all University property within your possession.

Sincerely,

Eva J. Pell

cc:    Wendell Courtney
       Rodney Erickson
       Raymond Hettche
       Bonnie Ortiz
       Charles Phillips
       Robert Secor

Ram B. Bhagat
2302 Oak Leaf Drive
State College, PA 16803

*Exh. D*

April 24, 2002

Ms. Evangeline Draper Hawthorne
Equal Employment Opportunity Commission
21 South 5th Street, Suite 400
Philadelphia, PA 19106-2515

Reference:     **Charge Number 17 FA13350**
               **Bhagat v. Penn State University**

Dear Ms. Hawthorne:

I am writing this letter in response to your letter of March 13, 2002. I thank you for granting me
extension until April 25, 2002 to submit my rebuttal of Respondent's position statement. My
rebuttal follows (item numbers below refer to the Respondent's ANSWER to my complaint):

3. a. Respondent has not provided any evidence to deny my complaint of plagiarization of my
research results by Dr. Amateau and Dr. Eden. The DENIAL is UNTRUE.

(3) I verbally complained to Dr. Amateau that I was discriminated because of my race, age, and
national origin and ancestry. The respondent's DENIAL is UNTRUE.

(4) Respondent's DENIAL is UNTRUE. The discriminatory actions increased after my complaint
of discrimination.
  (a) The respondent's DENIAL is UNTRUE. Dr. Amateau did attempt to steal my ExoFlash
      patent.
  (b) The respondent's DENIAL is UNTRUE. Drs. Amateau and Eden did secretly take over
      surface technologies department headed by me. This is an act of discrimination because
      of my race, age, and national origin and ancestry.
  (c) The respondent's DENIAL is UNTRUE. The ARL budget sheet includes my funded
      projects that were taken away from me by Drs Amateau and Eden.
  (d) The respondent's DENIAL is UNTRUE. In an act of discrimination because of my race,
      age, and national origin and ancestry, Dr. Amateau sabotaged my application for the
      position of materials and manufacturing office head. This is against the policies of the
      University (Penn State).
  (e) The respondent's DENIAL is UNTRUE. The respondent has not provided the names and
      supporting documents that two sponsors did not want to work with Dr. Bhagat for the
      projects led by Dr. Bhagat. This is an act of discrimination by Dr. Amateau because of
      my race, age, and national origin and ancestry.
  (f) The respondent's DENIAL is UNTRUE. Surface Technologies Department did exist and
      Dr. Bhagat headed it until the date of dismissal.
  (g) The respondent's DENIAL is UNTRUE. Dr. Amateau sabotaged my two new proposals.
      This is an act of discrimination because of my race, age, and national origin and ancestry.

(h) The respondent's DENIAL is UNTRUE. Dr. Amateau and Dr. Eden sabotaged my efforts in developing research programs with Praxair and BOC Gases. This is an act of discrimination because of my race, age, and national origin and ancestry.

(i) The respondent's DENIAL is UNTRUE. I am referring to a multi-million dollar initiative with U.S. Army, Navy, Marine, and several industrial partners to develop wear and corrosion resistant coatings. Dr. Bhagat organized a very successful meeting. Dr. Bhagat did invite Drs. Amateau and Eden who participated in this meeting. Drs. Amateau and Eden forced me out of this successful initiative. This is an act of discrimination because of my race, age, and national origin and ancestry.

(j) The respondent's DENIAL is UNTRUE. Funds were identified and were available to add a staff engineer. ARL records will PROVE THIS. Dr. Amateau's action is an act of discrimination because of my race, age, and national origin and ancestry.

(k) The respondent's DENIAL is UNTRUE. Established, lawful procedures were not followed in appointing Dr. Eden as deputy division head. I was not given an opportunity for this appointment. This action of Dr. Amateau is an act of discrimination because of my race, age, and national origin and ancestry.

(l) The respondent's DENIAL is UNTRUE. Also, Dr. Bhagat provided appropriate project/research plan numerous times to Dr. Amateau. The freezing of funds was aimed at denying Dr. Bhagat the opportunity to perform on the funded projects. This action of Drs. Amateau and Donnellan is an act of discrimination because of my race, age, and national origin and ancestry.

(m) The respondent's DENIAL is UNTRUE.

(n) The respondent's DENIAL is UNTRUE. Dr. Bhagat repeatedly complained (verbally) to Dr. Amateau about Dr. Amateau's acts of discrimination and harassment because of his race, age, and national origin and ancestry.

(o) The respondent's DENIAL is UNTRUE. See item 3.a.

(p) The respondent's DENIAL is UNTRUE. Dr. Amateau used Dr. Bhagat's research ideas in the DARPA proposal and denied Dr. Bhagat an opportunity to be a co-investigator. This action of Dr. Amateau is an act of discrimination because of my race, age, and national origin and ancestry.

(q) The respondent's DENIAL is UNTRUE. ARL documents will PROVE THIS.

(r) The respondent's DENIAL is UNTRUE. ARL documents will PROVE THIS.

(s) The respondent's DENIAL is UNTRUE. ARL documents will PROVE THIS. Dr. Bhagat is listed in ARL documents/budget sheet as a Principal Investigator on FOUR research programs, all sponsor-approved.

(5) Dr. Amateau and Dr. Donnellan ignored my complaints of discrimination and harassment because of my race, age, and national origin and ancestry. They committed acts of discrimination against me so that I would leave ARL.

(6) Dr. Amateau and Dr. Eden did plagiarize Dr. Bhagat's research results.

(7) The respondent's DENIAL is UNTRUE.

(b) The respondent's DENIAL is UNTRUE. ARL documents will PROVE that Dr. Amateau had full knowledge of the events leading to nullification of my invention disclosure on solving nozzle problems. This action of Dr. Amateau is an act of discrimination because of my race, age, and national origin and ancestry.

(1) The respondent's DENIAL is UNTRUE. ARL and Penn State documents will PROVE THIS.

(5) The respondent's DENIAL is UNTRUE. Penn State documents will PROVE THIS.

    (i)     The respondent's DENIAL is UNTRUE. ARL and Penn State documents will PROVE THIS.

(b) The respondent's DENIAL is UNTRUE. ARL and Penn State documents will PROVE THIS.

    (i)     The respondent's DENIAL is UNTRUE. ARL and Penn State documents will PROVE THIS.

c. The respondent's DENIAL is UNTRUE. Dr. Amateau and Dr. Eden repeatedly humiliated and harassed me. Their acts constitute an act of discrimination because of my race, age, and national origin and ancestry.

    (1) The respondent's DENIAL is UNTRUE. ARL documents will PROVE THIS.
        (a) The respondent's DENIAL is UNTRUE. I did not have full access to lab facilities.

    (2) Dr. Amateau and Dr. Eden were clearly told by Dr. Bhagat that they were humiliating him.
    (3) The respondent's DENIAL is UNTRUE.
    (4) The respondent's DENIAL is UNTRUE. Dr. Amateau and Dr. Eden deliberately planned and executed their acts of discriminatory treatments to Dr. Bhagat to force him to leave ARL.

d. The respondent's DENIAL is UNTRUE. ARL and Penn State documents will PROVE THIS.

(1) (a) Dr. Bhagat reiterates that Dr. Donnellan took no affirmative action on Dr. Bhagat's complaint of discrimination, harassment, and poor work climate. Dr. Donnellan himself discriminated Dr. Bhagat because of his race, age, and national origin and ancestry. Dr. Bhagat asked Dr. Donnellan to call a meeting to be attended by Dr. Amateau, Dr. Bhagat, Dr. Donnellan, a human resource representative, and at least one other person (outside of Dr. Donnellan's organization) to discuss the issues of discrimination. He NEVER CALLED SUCH A MEETING.

(b) Dr. Bhagat discussed in DETAIL with Mr. Phillips about the discrimination giving a copy of the letter Dr. Bhagat wrote to Dr. Donnellan. Mr. Phillips did not pursue appropriate investigation as mandated by University Policies. University documents will prove this.

    (i)     Dr. Bhagat reiterates that Mr. Phillips did not take affirmative actions. This constitutes an act of discrimination by Mr. Phillips against Dr. Bhagat because of his race, age, and national origin and ancestry.

(2) Dr. Amateau and Dr. Eden did steal Dr. Bhagat's idea.

e. The respondent's DENIAL is UNTRUE.

(1) (a) Dr. Amateau made those remarks immediately after my meeting with Dr. Donnellan. It is a serious act of discrimination against Dr. Bhagat because of his race, age, and national origin and ancestry.

(2) The respondent's DENIAL is UNTRUE. ARL documents will prove the fact that the sponsor had accepted and funded the project.

(3) The respondent's DENIAL is UNTRUE. Dr. Donnellan was a participant with Dr. Amateau in the acts of DISCRIMINATION AGAINST Dr. Bhagat. Dr. Donnellan did not call a meeting as suggested by Dr. Bhagat. Dr. Donnellan did not follow University Policies by NOT OBJECTIVELY INVESTIGATING the complaints of discrimination against Dr. Bhagat.

(a) The respondent's DENIAL is UNTRUE.

(4)      f. Dr. Bhagat reiterates that Dr. Amateau issued a memo containing three demands in an act of SERIOUS DISCRIMINATION AND INTIMIDATION in RETALIATION of Dr. Bhagat's complaints of discrimination because of his race, age, and national origin and ancestry.
(3) The respondent's DENIAL is UNTRUE.
                    (a) The respondent's DENIAL is UNTRUE.
                    (b) The respondent's DENIAL is UNTRUE.
                    (c) The respondent's DENIAL is UNTRUE.
(4) The respondent's DENIAL is UNTRUE.

g. The respondent's DENIAL is UNTRUE. The major alignment document DOES NOT DISSOLVE SURFACE TECHNOLOGIES DEPARTMENT AND DOES NOT REMOVE DR. BHAGAT FROM HEADING THE DEPARTMENT. ARL formal realignment document will prove this.

(5) Secret, illegal demotion of Dr. BHAGAT from department head is a serious act of discrimination against Dr. Bhagat because of his race, age, and national origin and ancestry.
(2) The respondent's DENIAL is UNTRUE. The major alignment document DOES NOT DISSOLVE SURFACE TECHNOLOGIES DEPARTMENT AND DOES NOT REMOVE DR. BHAGAT FROM HEADING THE DEPARTMENT. ARL formal realignment document will prove this. Secret, illegal demotion of Dr. BHAGAT from department head is a serious act of discrimination against Dr. Bhagat because of his race, age, and national origin and ancestry.
(3) The respondent's DENIAL is UNTRUE.
(4) The respondent's DENIAL is UNTRUE.
(5) The respondent's DENIAL is UNTRUE. Dr. Bhagat was SECRETLY DEMOTED in an act of discrimination against Dr. Bhagat because of his race, age, and national origin and ancestry.

h. (1) The respondent's DENIAL is UNTRUE. Dr. Bhagat was dismissed in RETALIATION OF HIS COMPLAINTS OF DISCRIMINATION because of his race, age, and national origin and ancestry. The dismissal represents a serious case of INTOLERANCE AND DISCRIMINATION. The reason of insubordination is a PRETEXT. Dr. Bhagat was not served NOTICE OF TERMINATION as required by UNIVERSITY POLICIES.

(4)The respondent's DENIAL is UNTRUE. I WAS NOT INSUBORDINATE.

(5) The respondent's DENIAL is UNTRUE.

(6) The respondent's DENIAL is UNTRUE. I WAS RETALIATED BECAUSE I COMPLAINED OF DISCRIMINATION AGAINST ME because of my race, age, and national origin and ancestry.

(7) The respondent's DENIAL is UNTRUE. I WAS NOT WARNED OF DISMISSAL EVEN VERBALLY; UNIVERSITY POLICIES REQUIRE A WRITTEN LETTER OF INTENT TO DISMISS.

(8) The respondent's DENIAL is UNTRUE. The appropriate procedures were not followed.

(9) I revealed all details of discrimination verbally to Dr. Amateau, Dr. Donnellan, Dr. Hettche, and Dr. Eden before my dismissal.

      (a) The respondent's DENIAL is UNTRUE.

(10)      The respondent's DENIAL is UNTRUE. The termination was WRONGFUL because of discrimination, retaliation, and intolerance. No legitimate job related reason of insubordination existed for termination.

      (a) Dr. Bhagat provided significant details of discrimination against him to Dr. Pell and Dr. Secor in addition to written chronology document.

      (i) Drs. Pell and Secor discriminated Dr. Bhagat by not taking affirmative actions. The respondent's DENIAL is UNTRUE.

(11) It is UNTRUE that Dr. Pell conducted an OBJECTIVE INVESTIGATION. Dr. Pell clearly discriminated Dr. Bhagat because of his race, age, and national origin and ancestry. The termination was not legitimate and it was discriminatory.

(12) (a) Dr. Bhagat's termination was wrongful. The respondent's DENIAL is UNTRUE. Dr. Spanier and Dr. Erickson did not nullify the termination because of THEIR ACTS OF DISCRIMINATION AND INTOLERANCE AGAINST DR. BHAGAT because of his race, age, and national origin and ancestry.

i. The Faculty Senate Committee has the jurisdiction to investigate Dr. Bhagat's dismissal. The Committee and the Chair committed a serious act of DISCRIMINATION AGAINST Dr. BHAGAT by refusing to investigate. THEY ACCEPTED MY PETITION. THEY DISCUSSED THE PETITION IN A FORMAL MEETING. Dr. Secor and Dr. Rambeau have asserted that the COMMITTEE has the jurisdiction to investigate Dr. Bhagat's dismissal. The respondent's DENIAL is UNTRUE.

(1) (a) Dr. Bhagat provided details with regard to his charges of discrimination. The respondent's DENIAL is UNTRUE.

(b) Dr. Rambeau, Committee Chair, did not give SPECIFIC REASON for their refusal to investigate the acts of discrimination against Dr. Bhagat by Dr. Amateau, Dr. Eden, Dr. Donnellan, Mr. Phillips, Dr. Hettche, Mr. Elliott, Dr. Pell, Dr. Secor, Dr. Erickson, and Dr. Spanier. The Committees refusal itself constitutes a serious case of administrative cover-up and an act of DISCRIMINATION AGAINST DR. BHAGAT because of his race, age, and national origin and ancestry.

The above REBUTTAL clearly demonstrates that Dr. Amateau, Dr. Eden, Dr. Donnellan, Mr. Phillips, Dr. Hettche, Mr. Elliott, Dr. Pell, Dr. Secor, Dr. Erickson, and Dr. Spanier of The Pennsylvania State University engaged in a serious act of DISCRIMINATION AGAINST DR. BHAGAT because of his race, age, and national origin and ancestry.

Sincerely,

Ram B. Bhagat

 

*Exh. E*

### Statement of Robert Secor

I, Robert Secor, Vice Provost for Academic Affairs at Penn State, state that the following is my best recollection of my contacts with Dr. Ram Bhagat concerning his termination of employment from the Applied Research Laboratory (ARL).

On March 22, 2001, Dr. Bhagat met with me to say that he had been dismissed from his position at ARL the previous day. I listened to his version of what had occurred and then asked him to do two things for me: 1) write up his version of events and send that document to me, and 2) speak directly with Eva Pell, Vice President for Research and Dean of the Graduate School, to whom Dr. Raymond Hettche, Director of ARL, reports. It was only then that I learned that he had already spoken with Dr. Pell (or perhaps had already scheduled an appointment with her, I don't quite recall which).

I then met with Dr. Pell to convey my conversation with Dr. Bhagat, and we agreed that she would review the case.

Subsequently I received Dr. Bhagat's written chronology of the events leading up to his dismissal and notification that he was going to schedule another appointment with me. I informed him that since Eva Pell was reviewing the matter, there was no need to meet with me again.

Within several days, however, Dr. Bhagat came to my office asking to speak with me. I saw him very briefly and don't have any notes, but I believe that at this time he asked me if he had any other avenue of appeal (besides Vice President Pell). I referred him to the Senate Committee on Faculty Rights and Responsibilities. Subsequently I met with Dr. Bhagat concerning the Committee's decision that they did not have jurisdiction under the circumstances. I did not have any subsequent role in relation to Dr. Bhagat's complaint.

_____     Date: 6/10/2002

Robert Secor

# PENN STATE

*Exh. F*



**University Faculty Senate**

The Pennsylvania State University
101 Kern Building
University Park, PA 16802-3300

(814) 863-0221
Fax: (814) 863-6012

April 19, 2001

Ram Bhagat
2302 Oak Leaf Drive
State College, PA 16803

Dear Dr. Bhagat:

The Faculty Rights and Responsibilities Committee met today, discussed your petition, and decided that we must first address questions of our jurisdiction. We will be in touch with you again shortly.

With best wishes.

James M. Rambeau, Chair,
Senate Committee on Faculty
Rights and Responsibilities

xc: Members, FR&R Committee
    Robert Secor

**PENNSTATE**

*Exh. G*



University Faculty Senate

The Pennsylvania State University
101 Kern Building
University Park, PA 16802-3300

(814) 863-0221
Fax: (814) 863-6012

May 17, 2001

Ram Bhagat
2302 Oak Leaf Drive
State College, PA  16803

Dear Dr. Bhagat:

As I wrote to you on 19 April, the Faculty Rights and Responsibilities Committee discussed your petition on that day and concluded that our first task was to determine whether or not it fell within our jurisdiction.  I regret to say that it does not.

Your appointment in the Applied Research Laboratory was an academic appointment to the research faculty of the Applied Research Laboratory, although the Applied Research Laboratory is not a tenure-granting entity, nor is it an academic college.  While you taught on occasion in the College of Engineering, and were granted the professorial title under the provisions of HR-24 (which is designed to provide recognition and credit, but no other consideration), it remains true that your position within the Applied Research Laboratory is not governed by the rules of HR-23.

Your dismissal had no relation to your professorial appointment within the College of Engineering, and was based solely on the judgment of your superiors in the Applied Research Laboratory. Thus, these are matters beyond the scope of the charge of this Committee.

Sincerely,

James Rambeau, Chair,
Senate Committee on Faculty
Rights and Responsibilities

xc: R. Secor
    J. Elliott
    W. Courtney
    B. Ortiz

.e: Fwd: Dismissal of Dr. Ram B. Bhagat at ARL



**Subject: Re: Fwd: Dismissal of Dr. Ram B. Bhagat at ARL**
    **Date:** Wed, 28 Mar 2001 12:32:11 -0500
  **From:** Robert Secor <rxs2@psu.edu>
      **To:** "ram b. bhagat" <jaihind99@home.com>

*Exh. H*

Ram:  I'm still looking into what appeal options would be most applicable
to you, and will get back to you as soon as I have the answers.  Meanwhile,
President Spanier has indicated that it would not be appropriate to meet
with you since we are all going through the official notification and
review channels, none of which involve him or allow for his intervention.
Robert Secor
Vice Provost for Academic Affairs
201 Old Main
(814) 863-7494



**Subject: Re: Dismissal of Dr. Ram B. Bhagat at ARL**
**Date:** Thu, 29 Mar 2001 11:17:14 -0500
**From:** "Rodney A. Erickson" <rae@psu.edu>
**To:** "ram b. bhagat" <jaihind99@home.com>
**CC:** mln2@psu.edu, jaihind99@home.com

*Exh. I*

Dr. Bhagat:

I am aware of your termination and have reviewed the case with Dr. Eva
Pell. As a former employee of the Applied Research Laboratory, it is
appropriate that the Office of the Vice President for Research and the
Office of Human Resources handle any further inquiries related to your
dismissal.

Rod Erickson


At 02:52 PM 3/26/2001 -0500, ram b. bhagat wrote:
>Dear Dr. Erickson:
>
>I have been Penn State proud for the last seventeen years as a faculty
>at ARL. On March 21 I was dismissed. I have prepared a brief chronology
>of major events (see the attachment) leading to the dismissal in
>violation of my faculty rights.
>
>I will call your office to schedule a brief meeting with you to discuss
>this matter. I will provide you a hard copy of the complete package on
>the chronology of major events.
>
>My web page (below) has hot links to my resume and dossier.
>
>
>Thank you.
>
>Ram
>
>Ram B. Bhagat
>Tel: 814-238-3584
>Cell: 814-880-0098
>E-mail: jaihind99@home.com
>URL: http://www.members.home.net/jaihind99/


Rodney A. Erickson
Executive Vice President and Provost
The Pennsylvania State University
201 Old Main
University Park, Pennsylvania  16802

(814) 865-2505    FAX (814) 863-8583

of 1                                                              3/29/01 11:14 AM



Exh. J

## Statement of Eva J. Pell

I, Eva J. Pell, Vice President for Research and Dean of the Graduate School, recall that the following was my involvement in Ram Bhagat's case.

I met with Dr. Bhagat on March 22, 2001. He discussed with me his assertion that his employment at the Applied Research Laboratory (ARL) was terminated in retaliation for complaints he lodged of discrimination, harassment, and a hostile work environment. I believe that on that same day, Dr. Robert Secor, Vice Provost for Academic Affairs, conferred with me as Dr. Bhagat had met with him also. It was decided that as the Vice President for Research was the supervisor of the Director of ARL, I was the appropriate person to review this matter.

I conferred with Charles Phillips, Assistant to the Director of ARL for Human Resources, James Elliott, Director of Human Resources of Penn State, L. Raymond Hettche, Director of ARL, Thomas Donnellan, Associate Director of Materials and Manufacturing at ARL, who was the supervisor of Maurice Amateau, Dr. Bhagat's immediate supervisor, and with legal counsel. I also reviewed written correspondence between Ram Bhagat and Maurice Amateau, and Ram Bhagat and Thomas Donnellan regarding their expectations of Dr. Bhagat during the months preceding Dr. Bhagat's termination.

I concluded that Dr. Bhagat had indeed been unresponsive and obstructionistic to the reasonable requests of his superiors. Also Dr. Bhagat had been given fair warning that disciplinary action of this type would be taken against him, if he did not address the serious concerns brought to his attention numerous times.

In my assessment of this case, I found no evidence of discrimination and no evidence that Dr. Bhagat had been terminated for complaining about such alleged discrimination, harassment, and hostile work environment.

_____
Eva J. Pell

Date: June 7, 2002

 

*Exh. K*

## Statement of L. Raymond Hettche

I, L. Raymond Hettche, Director of Penn State's Applied Research Laboratory (ARL). state the following from my recollection of events involving the termination of Ram Bhagat's employment with the Laboratory.

In June 2000, I announced a major realignment at ARL, effective July 1, 2000. This included a reorganization of the Material Science and Technology Division of the Materials and Manufacturing Office. Among many other changes, Ram Bhagat, who had been head of the Division's Surface Engineering Department, which would no longer exist under the new Materials Processing Division, was to lead a new initiative in nanomaterials technology.

Sometime in July, I received a telephone call from Dr. Bhagat indicating his displeasure concerning the changes and his new responsibilities. I told him that I supported the reassignment and that he had to follow Dr. Amateau's directives and communicate with him.

Subsequent to the realignment, both Tom Donnellan, the new Associate Director for Materials and Manufacturing (Dr. Amateau's supervisor and Dr. Bhagat's second level supervisor), and Chuck Phillips, Assistant to the Director for Human Resources, kept me informed of Ram Bhagat's recalcitrant behavior. I also spoke with Dr. Amateau on several occasions about the required necessary detailed research plan that he had requested from Dr. Bhagat on a number of occasions but was not forthcoming.

I asked Chuck Phillips on several occasions to inform Dr. Bhagat of the potential serious consequences if he continued his insubordinate conduct and to advise him to obey his supervisor's directives and communicate with him.

In addition, I was made aware of Dr. Bhagat's ever-growing list of allegations against Dr. Amateau, Dr. Eden, Dr. Donnellan, and myself. These included intellectual property theft, plagiarism, proposal sabotage, poor work climate, harassment, discrimination, and retaliation. In all cases, I found that Dr. Bhagat's allegations were groundless. As to his general allegation of discrimination, Dr. Bhagat was informed that he needed to supply specific information so it could be looked into; however, in the interim he had to work in accordance with his supervisor's directives. Dr. Bhagat refused to give any information concerning his allegation until he determined that it was the appropriate time.

Finally in March 2001, Dr. Bhagat's insubordinate behavior caused me to approve allowing him either to resign or to have his employment terminated. Dr. Bhagat chose the latter.

_L. R. Hettche_      Date: _6-20-02_

L. Raymond Hettche

*Exh. L*

Date: Tue, 20 Jun 2000 17:14:25 -0400
X-PH: V4.1@f05n13
From: Richard Stern <rstern@psu.edu>
Subject: Laboratory Realignment
X-Sender: rxs23@email.psu.edu (Unverified)
To: arl-all@countess.arl.psu.edu
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.1
Sender: owner-arl-all@countess.arl.psu.edu
Reply-To: Richard Stern <rstern@psu.edu>

Date:    20 June 2000

Subject: Laboratory Realignment

From:    L. R. Hettche

To:      Associate and Assistant Directors

Info:    All Hands

The following changes in ARL's management and administrative structures
will be instituted on 1 July 2000.  This realignment is judged to be
necessary and prudent, accommodating changes in personnel, programs,
and market dynamics.

Director's Office (L. R. Hettche)

1.  P. R. Righter will assume the position of Assistant Director
for Finance, Business and Administration, reporting to the Director,
with supervisory responsibilities for the following offices: Business,
Accounting, Contracting, Purchasing, Human Resources, Publications.

2.  The Electro-Optics Center (K. A. Harris) and iMast Director
(R. B. Cook*) will now report to the Director.

3.  L. M. Siebenrock will now report to the Director as Assistant
to the Director for Facilities.

4.  M. F. Amateau will assume responsibility for the Drivetrain
Center and Gear Research Institute and report to the Director.

5.  Establish position of Assistant Director for Computer Services
(R. C. Marboe*) reporting to the Director, with supervisory and
management responsibilities for all computer services and networking.

Deputy Director's Office (R. Stern)

1.  Change name to Associate Director for Research and Academic
Programs.

2.  The Acoustics Division will be transferred to the Research and
Academics Programs Office, and D. L. Bradley, Head, Acoustics
Division, will now report to the Associate Director.

3.  Establish Visualization Laboratory under Research and Academic

Programs; T. A. Shaw, Head, Visualization Laboratory will report to the Associate Director.

Undersea Systems Office (E. G. Liszka)

1. Change name of Simulation and Visualization Department to System Analyses Department (L. S. Sheckler*)

Materials and Manufacturing Office

1. Transfer of EB-PVD Department (J. Singh) from High Energy Division to Materials Science Division reporting to M. F. Amateau.

2. Appoint R. P. Martukanitz* to Assistant Director, Head Laser Processing (formerly High Energy Processing).

3. Change the name of Materials Science Division to Materials Processing Division.

4. Change Polymer Matrix Composite Department from department to division level as Advanced Composites Materials Division (J. Sabo-acting head).

Submarine and Ship Technology Office (C. Brickell)

1. Change name to the Fluids and Structural Mechanics Office.

2. Change the following departments to division level status:
    Fluid Mechanics (M. L. Billet)
    Hydroacoustics (D. E. Capone)
    Computational Mechanics (H. J. Gibeling - acting)
    Operations (F. E. Smith)

Communication and Information Office (D. L. Hall)

1.     Change name to Information and Network Systems Office.

*New appointments

*Exh. M*

# High Rate Machining of Ti Blisks and Disks - A0974

| Project Status: Active | Revised: 8/23/00 | Project Book: 2000 |
|---|---|---|
| Start Date: 10/1/00 | Edit | End Date: 9/30/03 |

Show All Data    Revisions    ROI Download

PA Funding    Quarterly Status    Tasks/Milestones    ROI Chart    Related Issues

| MARCOR | NAVAIR | NAVSEA | NAVSUP | SPAWAR | ONR |

View
2000

| | Related SYSCOM Organization and Weapon Systems | | | |
|---|---|---|---|---|
| | SYSCOM | PEO | PO | Weapon System List |
| P | NAVAIR | PEO(T) | PMA265 | F/A-18 Hornet |
| S | NAVAIR | JSF | JSF | Joint Strike Fighter |

| Command | Performing Activity Edit | Technical Assistant Edit | Program Officer Edit |
|---|---|---|---|
| NAVAIR Mr. Martin Ryan | IMAST Dr. Ram B Bhagat | NAVAIR (Propulsion & Power Systems Engineering) Mr. Chris A. Georgiou | NAVSEA Mr. James Mattern |

| JDMTP | Thrust | Subthrust | Product | REPTECH |
|---|---|---|---|---|
| n/a | n/a | n/a | n/a | No |

## Objective:                                                                    Edit

The primary objective is to fabricate complex cutting tool geometries of the fully dense nanostructured cemented carbides for substantially improved machining of titanium alloys used in the manufacture of components in the F414 engine. A tenfold increase in tool life is expected. Development of appropriate high speed machining parameters for specifically Ti-17 alloy and tool diagnostics are important objectives for demonstrating significant reduction of machining costs. A major objective is to develop a plan for effectively transitioning the developed technologies to industries.

## Benefits:                                                                    Edit

# Titanium Machining Improvements for the Tomahawk Engine - A0890

| Project Status: Active | Revised: 8/23/00 | Project Book: 2000 |
|---|---|---|
| Start Date: 6/1/96 | Edit | End Date: 9/30/01 |

Show All Data   Revisions   ROI Download

PA Funding   Quarterly Status   Tasks/Milestones   ROI Chart   Related Issues

| MARCOR | NAVAIR | NAVSEA | NAVSUP | SPAWAR | ONR |
|---|---|---|---|---|---|
|  | Primary |  |  |  |  |

View
2000 ▼

## Related SYSCOM Organization and Weapon Systems

| SYSCOM | PEO | PO | Weapon System List |
|---|---|---|---|
| P | NAVAIR | PEO(CU) | PMA280 | Cruise Missile Command & Control |

| Command | Performing Activity Edit | Technical Assistant Edit | Program Officer Edit |
|---|---|---|---|
| NAVAIR Mr. Chris A. Georgiou | IMAST Dr. Ram B Bhagat | NAVAIR (Propulsion & Power Systems Engineering) Mr. David Hartsig | NAVSEA Mr. James Mattern |

| JDMTP | Thrust | Subtech | Product | REPTECH |
|---|---|---|---|---|
| Metals | Processing Methods | Machining | Engines | No |

## Objective:                                                                Edit

The initial goal of this project is to enhance the cutting performance of cutting tools by at least a factor of two, which will permit the cutting of a complete 22 blade compressor section with just one cutting tool. The ultimate goal is to increase the cutting performance by at least a factor of four, which will permit the cutting of a 44 blade compressor section with just one cutting tool.

Because of the difficulties in cutting titanium, current cutting tools are not robust enough to complete the fabrication of a complete F-107 compressor stage. This lack of performance causes an interruption in the fabrication process, increases the cost of manufacture, and affects the quality and manufacturing tolerances of the compressor section.

## Benefits:                                                                Edit

Based on proprietary information provided by Williams International, a two-fold improvement in current cutting tool performance will equate to a cost savings of $480K/year. A four-fold improvement will provide a cost savings of $960K/year to the Tomahawk program. These are the savings for just one program. Industry estimates that the results of this project, when applied to other systems containing machined titanium components, have the potential to save the Department of Defense (DOD) at least $5M/year. These cost savings will be the result of lower labor costs, lower cutting tool inventory costs, and improved quality.

## Applicable Weapon System:                                              Edit

 

# Cold Gas Dynamic Spraying of Wear Resistant Coatings for Aircraft Carrier Catapult Pistons - A0950

| Project Status: Active | Revised: 8/23/00 | Project Book: 2000 |
|---|---|---|
| Start Date: 5/1/99 | Edit | End Date: 9/30/00 |

Show All Data    Revisions    ROI Download

PA Funding    Quarterly Status    Tasks/Milestones    ROI Chart    Related Issues

View
2000 ▼

| MARCOR | NAVAIR | NAVSEA | NAVSUP | SPAWAR | ONR |
|---|---|---|---|---|---|

## Related SYSCOM Organization and Weapon Systems

| SYSCOM | PEO | PO | Weapon System List |
|---|---|---|---|
| There are no Weapon systems related to this project! | | | |
| Command | Performing Activity Edit | Technical Assistant Edit | Program Officer Edit |
| NAVAIR Mr. Martin Ryan | IMAST Dr. Ram B Bhagat | NAWC - Lakehurst Mr. Steve Opet | NAVSEA Mr. James Mattern |

| JDMTP | Thrust | Subthrust | Product | REPTECH |
|---|---|---|---|---|
| Special Topics | Repair / Sustainment | n/a | Ships | No |

## Objective: <span style="float:right">Edit</span>

Since the initial development of the catapult launching system, gross launching weights have steadily increased due to aircraft maturation and changing operational requirements. Although numerous advances and modifications to the catapult system have helped offset these increases, the catapult system is currently experiencing reduced service life. As a direct consequence of these problems, the service life of the entire MOD II piston assembly has decreased by 38%. This reduction in service life has in turn, significantly increased the life cycle and maintenance costs of the catapult system, as well as negatively impacting mission readiness by requiring extensive maintenance actions at sea.

One of the principal drivers for maintenance actions on the entire catapult system is replacement of the steam catapult pistons. The pistons are currently made from 2618-T6 aluminum forgings. These pistons are 18-21 inches in diameter and are being affected by adverse wear within the steel cylinders in which they ride. Due to this adverse wear, the pistons must be replaced every 2000 to 3500 launch cycles. A catapult system normally averages 4000 cycles annually. This means that a decision must be made either to replace the pistons prematurely during an in-port period or risk an at-sea maintenance action which can have a tremendously negative impact on aircraft carrier OPTEMPO and could be a safety issue.

This project will eliminate/minimize the adverse wear of the catapult piston and will increase the service life of the pistons to 8000 cycles (2 years between replacement cycles).

## Benefits: <span style="float:right">Edit</span>



# Advanced Manufacturing Process for AAAV Tracks and Roadwheels - C0900

| Project Status: CancelledPendingCloseout | | Revised: 8/29/00 | Project Book: 1999 |
|---|---|---|---|
| Start Date: 8/1/97 | Edit | | End Date: 9/30/00 |

Show All Data    Revisions    ROI Download

PA Funding    Quarterly Status    Tasks/Milestones    ROI Chart    Related Issues

View
2000 ▼

| MARCOR | NAVAIR | NAVSEA | NAVSUP | SPAWAR | ONR |
|---|---|---|---|---|---|
| Primary | | | | | |

## Related SYSCOM Organization and Weapon Systems

| | SYSCOM | PEO | PO | Weapon System List |
|---|---|---|---|---|
| P | MARCOR | MARCOR | PM AAAV | AAAV |

| Command | Performing Activity Edit | Technical Assistant Edit | Program Officer Edit |
|---|---|---|---|
| MARCOR Ms. Amy R. Rideout | IMAST Dr. Ram B Bhagat | Direct Reporting Program Manager AAAV Mr. Scott Story | ONR MANTECH DET Mr. Ted Hicks |

| JDMTP | Thrust | Subthrust | Product | REPTECH |
|---|---|---|---|---|
| Metals | Processing Methods | Forming And Consolidation | General | No |

## Objective:                                              Edit

The objective of this project is to provide lightweight track pins and lightweight road wheel wear surfaces, utilizing advanced material manufacturing processes.

## Benefits:                                              Edit

Project benefits are based on total Advanced Amphibious Assault Vehicle (AAAV) track system weight savings. Using a high strength aluminum for the track pin will save 457 pounds. Alternative materials for the roadwheel wear ring will save 415 pounds. Total approximate weight savings to the AAAV track system will be 873 pounds.

## Applicable Weapon System:                                              Edit

This project will support the Marine Corps AAAV. Results of this project can impact retro-fit programs for the M1A1 tank and the Bradley Fighting Vehicle.

## Technical Approach:                                              Edit

NOV 1 7 2000

# PENNSTATE

INTEROFFICE CORRESPONDENCE

Applied Research Laboratory

*Exh. N*

Date:       November 15, 2000

Subject:    *Organization of Materials Processing Division*

From:       M. F. Amateau

To:         Materials Processing Division and The Drivetrain Technology Center

Info:       Associate and Assistant Directors

Via:        T. M. Donnellan, L. R. Hettche    NOV 2 0 2000

As a result of my new responsibilities with the Drivetrain Technology Center, I am reassigning responsibilities within the Materials Processing Division to allow me to devote more time to the Drivetrain Technology Center activities. Dr. T. J. Eden will continue as the Deputy Division Head for the Materials Processing Division. Dr. Eden will also continue as Head of the Metals and Ceramics Processing Department. Dr. Singh will continue his responsibilities for high energy coating systems and EBPVD processing. I will continue to exercise overall responsibility for the Material Processing Division, but I am assigning administrative responsibilities to Dr. Eden for all activities being carried out at Cato Park. These include the areas of spray metal forming, high velocity particle consolidation, catapult and arresting gear programs, nanoparticle technology and thermoeleastic tailoring of ballistic and wear components.

Division faculty and staff at Cato Park will henceforth report directly to Dr. Eden. He will have the authority to assign research projects to all faculty and staff working at Cato Park.

Ram,
These are notes from the Division meeting
TJE

Cato Park Group of the Material Processing Division          2-2-01

Exh. O

AREAS OF RESPONSIBILITY

Wear Resistant Coatings          – Joe Conway
Nanograin Materials              - Ram Bhagat
HVPC/ Spray Metal Forming        - Tim Eden
High Pressure Lab                - Mike Vanatta

Steve Johnson will be in charge of the Metals and Ceramics Processing Department when I am away

Division personnel will be assigned as needed to support the funded projects
Attempts will be made to allow people to work in areas where they have an interest, as funding allows
Collaboration and peer review of projects is needed

PROGRAM INFORMATION
Navy funded program information should be kept in the Material Processing Division Folder
Access will be restricted to those to need the information
Reports, proposals, and other documents must be reviewed by division management

TASK ASSIGNMENT

STAFF – Normally written assignments will be handed out.  They contain a brief description of the task, the people responsible, a due data, and an estimated time required to complete the job.  Once a task is complete, a brief summary will be handed in on the original sheet.

If you are doing work for another group at ARL it is your responsibility to turn in a task sheet so we can plan accordingly.

Task assignments will be used for planning, budgeting, cost estimation and yearly evaluations.

Tasks assignments are based on ability, availability, and past performance.

DIVISION MEETINGS WILL BE SCHEDULED BY ROSE STEWART
You must see me if you are going to miss the meeting
These and other meets are to be held at my request or the request of Dr. Amateau.

Division meetings will be held in the future to discuss projects, investigate new ideas, and division issues.